# Status of Nonimmigrant Alien Temporary Workers During a Strike

Conclusion of prior opinion, 3 Op. O.L.C. 179 (1979), relating to status of nonimmigrant alien soccer players during a strike in North American Soccer League, reconsidered and affirmed.

There may be situations in which Immigration and Naturalization Service regulation requiring a nonimmigrant temporary worker, as a condition of his or her continued stay in this country, to cease working during a strike, would be sustained as a valid exercise of the Attorney General's authority under the Immigration and Nationality Act.

February 1, 1980

MEMORANDUM OPINION FOR
THE ACTING COMMISSIONER
IMMIGRATION AND NATURALIZATION SERVICE

This responds to your request that we reconsider our opinion of April 18, 1979 [3 Op. O.L.C. 179 (1979)] relating to the status of nonimmigrant alien temporary workers during a labor dispute. In this opinion, prepared in the context of a then-existing strike called by the North American Soccer Players League, we concluded that the Immigration and Nationality Act (INA) and applicable regulations of the Immigration and Naturalization Service (INS) neither barred nonimmigrant alien players employed by the League from continuing work during the strike, nor required their deportation if they honored or refused to honor the strike. Subsequently, in July of 1979, having been provided with documents suggesting that the INS regulation in question had been administratively construed to require nonimmigrant alien temporary workers to cease working during a strike, we expressed doubts as to whether that regulation would be upheld in a situation such as the soccer strike. [3 Op. O.L.C. 294 (1979).]

Since our earlier opinions were prepared, we have been provided more specific factual information about the relationship between the regulation's requirement as so construed and the INA itself. In response to your request, we have undertaken a reexamination of our earlier conclusions in light of this information, focusing now more generally on the question of the Attorney General's power under the INA to require a nonimmigrant temporary worker, as a condition of his or her continued stay in this country, to cease working during a strike. While

366

we believe our earlier opinions correctly state the law, we are persuaded that there may be situations in which a sufficient relationship would be found between such a requirement and the legislative purposes underlying the INA to sustain it as a valid exercise of the Attorney General's authority under the Act.

The INS regulation in question appears at 8 C.F.R. § 214.2(h)(10) (1981) and reads as follows:

> A petition shall be denied if a strike or other labor dispute involving a work stoppage or layoff of employees is in progress in the occupation and at the place the beneficiary is to be employed or trained; if the petition has already been approved, the approval of the beneficiary's employment or training is automatically suspended while such strike or other labor dispute is in progress.

When this Office was initially asked to advise whether, pursuant to this regulation, nonimmigrant alien soccer players on H-1 and H-2 visas [1] were required to cease working during the pendency of a strike, we had before us no information as to the original purpose of the regulation and were advised that no such information was available. Further, we understood that there was no helpful history of its application to provide guidance as to its meaning. By its terms, however, the regulation appeared to be intended to prevent an employer involved in a labor dispute from importing nonimmigrant aliens as strike-breakers. As applied to aliens whose employment would begin after the commencement of the strike, the regulation seemed only to give particular content to the statutory requirement that nonimmigrant alien temporary workers not be admitted if unemployed persons capable of performing the requested service or labor could be found in this country, since it could reasonably be concluded that the requisite determination in this regard could not be made while a strike was in progress.

We expressed doubt, however, that the regulation could properly be interpreted to require the automatic suspension of the employment approval of nonimmigrant aliens who were already in the country and working at the time the strike occurred. Our reasoning was that any such aliens presumably could only have been admitted after a finding that unemployed workers capable of performing the duties could not be found in this country, and that the mere existence of a strike did not suggest that capable domestic workers could be found, thereby warranting suspension of approval of the alien's employment. In this case, therefore, we could not see that the automatic suspension of work

---

[1] Under the INA, nonimmigrant aliens may, upon petition by an employer, be admitted into the country on a temporary basis (1) to perform services of an exceptional nature requiring distinguished merit and ability or (2) to perform services or labor "if unemployed persons capable of performing such service or labor cannot be found in this country. . . ." 8 U.S.C. § 1101(a)(15)(H)(i) and (ii).

approval was rationally related to the purposes of the Act and thus within the Attorney General's authority.

A second reason for reading the regulation so as not to bar continued employment of the nonimmigrant alien soccer players was found in the National Labor Relations Act (NLRA), which has been construed by the National Labor Relations Board to apply to nonimmigrant alien temporary workers. Section 7 of that Act, 29 U.S.C. § 157, affords employees the right to decide whether or not to engage in concerted activity, including whether or not to participate in or honor a strike. If the INS regulation were to be interpreted to require the automatic suspension of employment approval whenever a strike occurs, nonimmigrant alien temporary workers would effectively be deprived of the freedom to decide not to honor the strike. We concluded that the regulation should not be interpreted in a manner which would occasion this result.

On July 18, 1979, we responded to a request from Secretary of Labor Marshall that we reconsider our April 18 opinion. Having in the interim had an opportunity to review a number of documents that were not available to us at the time our original opinion was prepared, we concluded that the regulation in question did appear to have been administratively construed (although never actually applied) to require a nonimmigrant to cease working during a strike. However, focusing now not on the meaning of the regulation but on its validity, we expressed our continuing doubts as to whether the regulation would be upheld if applied in a situation such as the soccer strike. Our reasoning remained essentially the same as that in our original opinion. First, the broad and unconditional requirement that an employee withhold his services during a work stoppage appeared to impinge upon the individual's rights under § 7 of the NLRA, and potentially to upset the balance struck by Congress under that Act between labor and management, without serving any discernible purpose under the INA. And second, while the Attorney General's authority under the Act to impose conditions upon a nonimmigrant's visa is very broad, in the absence of specific factual information about how the regulation related to the purposes of the INA, we questioned whether it extended this far. As explained in our response to Secretary Marshall, we had been pointed to no specific instances of employer "stockpiling" or other abuses of the temporary worker system that enforcement of the regulation could resolve.

We closed our letter to Secretary Marshall by recognizing that, while it is generally appropriate for INS to maintain a neutral role in a labor dispute, there may be situations in which it would be equally appropriate under the INA to limit alien involvement in domestic labor disputes. We informed him that we had agreed to assist INS in drafting a

regulation that would be more precisely tailored to the purposes of the INA and less likely to precipitate conflicts with the NLRA.

Since our July 18 letter to Secretary Marshall, we have had brought to our attention, most notably by the Solicitor's Office in the Labor Department, specific factual information that purports to relate the regulation to the purposes of the INA. In addition, the broad ambit of the Attorney General's authority under that Act to impose conditions on nonimmigrant aliens has received recent judicial reaffirmation. *Narenji* v. *Civiletti*, 617 F.2d 745 (D.C. Cir.), *cert. denied*, 446 U.S. 957 (1979). Finally, your memorandum of January 4, 1980, suggests that certain modifications in the regulation itself are under consideration; some of these narrow its reach to situations in which its enforcement could be shown or at least reasonably presumed to be furthering the purposes of the INA, and so limit its operation to employees not covered by the NLRA, such as agricultural workers. While we continue to believe that difficult legal questions would be presented by the enforcement of the regulation in many situations, even if it were modified in one or more of the ways suggested in your memorandum, we cannot say that there are no circumstances in which it would be permissible to require nonimmigrant alien temporary workers to cease working during a strike.

The courts have recognized that an underlying purpose of the INA's restrictions on immigration is the protection of domestic workers, a purpose that extends to its provisions on nonimmigrant temporary workers as well. *See, e.g., Flecha* v. *Quiros*, 567 F.2d 1154, 1155 (1st Cir. 1977). The importation of temporary alien workers should not operate to depress domestic wages, nor otherwise hinder efforts by domestic workers to improve their wages and working conditions. If it is true, as the Labor Department has contended, that "[c]ontinued employment of temporary aliens during a strike could have an adverse effect on the wages and working conditions of the striking domestic employees by helping to defeat the strike," some measures to prevent this result may be appropriate under the INA.

The Labor Department has also argued that nonimmigrant temporary workers have as a practical matter little true freedom of choice as to whether to participate or not participate in a strike. Barred by law from accepting employment elsewhere, they are peculiarly susceptible to pressure to remain on the job. Their rights under § 7 of the NLRA are, in Labor's view, "illusory." Far from assuring government neutrality in labor disputes, permitting the continued use of alien labor during a strike would, it is said, tip the balance of economic weapons in management's favor.

We are inclined to agree that a regulation tailored to meet the particular problems described by the Labor Department—the peculiar susceptibility of nonimmigrant temporary workers to employer pres-

sure, and the threat this poses for efforts by domestic workers to improve their working conditions through collective action—might well be held to be an appropriate attempt by the government to preserve for itself a more nearly neutral role in labor-management relations. The situation in which we think such a regulation is most likely to be held a valid exercise of the Attorney General's power under the INA is that in which temporary workers are not protected by those federal labor laws which secure an individual's freedom to participate or not in concerted activities. Not only is there no potential conflict with those laws posed by the regulation's enforcement in this situation, but there is greater likelihood that nonimmigrants will remain on the job under pressure if they have no hope of federal assistance against employer retaliation.

We remain troubled, however, by the notion that a nonimmigrant's stay in this country could be conditioned on his not doing precisely what he was brought here to do, i.e., to work for the petitioning employer. Unlike a prohibition on unauthorized employment by students or visitors, or a regulation requiring a student to request permission from INS before transferring to a new school, the automatic suspension of work approval in the event of a strike seems unrelated to the definition and maintenance of the particular nonimmigrant status of a temporary worker.

The fact that the present regulation can be enforced only through the institution of deportation proceedings adds to our concern. As we stated in our letter to Secretary Marshall, a rule which triggers the penalty of deportation without some finding that the grounds of entry no longer exist, or that there are some statutory grounds for deportation, seems likely to be found unreasonable in many situations. We think it would present particularly troublesome issues if invoked to deport an individual solely because he chose not to participate in a strike against his employer.

On balance, while we think the legal questions raised by a work suspension requirement are close ones in any case, and likely to be quite fact-sensitive, we cannot say that the Attorney General does not have the power under the INA to fashion such a regulation under some circumstances. As is suggested by the preceding discussion, any such regulation should be precisely tailored to deal with the potential abuses pointed out by the Labor Department. In addition to those modifications you suggest,[2] it might be prudent to incorporate a provision affording a petitioning employer, and possibly the beneficiary of the petition as well, an opportunity to demonstrate that the nonimmigrant's continuing to work during a strike would not adversely affect the

---

[2] We do not mean to imply a preference for any particular modification, nor to suggest that any (or all) of those suggested in your memorandum would be necessary to sustain the regulation's validity in all cases.

wages and working conditions of domestic workers, in helping to defeat the strike or otherwise. In the event such a showing could be made, a corresponding accommodation in enforcing the regulation would seem in order.

As in the past, we would be pleased to continue to work with you in reviewing language designed to achieve a fact-specific, case-by-case mechanism for dealing with the effect of strikes and work stoppages on nonimmigrant alien workers.

LARRY A. HAMMOND
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
